# Syllabus

Chief Justice:
  Bridget M. McCormack

Chief Justice Pro Tem:
  David F. Viviano

Justices:
  Stephen J. Markman
  Brian K. Zahra
  Richard H. Bernstein
  Elizabeth T. Clement
  Megan K. Cavanagh

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

*In re* FERRANTI, Minor

Docket No. 157907.  Argued on application for leave to appeal October 10, 2018.  Decided June 12, 2019.

The Department of Health and Human Services (the Department) petitioned the Otsego Circuit Court, Family Division, to remove JF, a minor, from the care of respondents, her parents. JF had spina bifida, a birth defect that affects the development of the spinal cord and that caused JF to require medical care and supervision for her entire life.  In particular, JF had trouble ambulating without the aid of a mobility device and had to use a catheter to urinate.  In 2015, the Department petitioned the court for JF's removal, alleging that respondents had failed to adequately attend to JF's medical needs by missing several medical appointments and by failing to regularly refill her prescription medications.  The Department also alleged that the living conditions in respondents' home posed a health risk to JF because it was cluttered, dirty, and had a strong odor of animals and urine.  The court held an emergency hearing and placed JF in foster care, but the court permitted her to have unsupervised visits at respondents' home.  After several more hearings, the trial court found probable cause to authorize the petition and set an adjudication trial.  At a preadjudication status conference, respondents admitted that they had not refilled several of JF's prescriptions, and the court exercised jurisdiction over JF.  In taking respondents' pleas, the court did not advise them that they were waiving any rights nor did the court advise them of the consequences of their pleas, as required by MCR 3.971.  In January 2016, the court adopted the Department's proposed family treatment plan, which, among other things, required that respondents maintain a clean home.  The court concluded the final dispositional hearing in October 2016 by authorizing the Department to file a termination petition, but the court noted that its decision was limited to that procedural step.  The parties disputed the home's suitability for JF, and the court stated that it wanted to see the home for itself.  The court visited the home in February 2017 but did not document its observations and factual findings.  Additionally, during the termination hearing, the court conducted an *in camera* interview with JF but made no record of the conversation.  The court, Michael K. Cooper, J., ultimately terminated respondents' parental rights.  Respondents appealed.  The Court of Appeals, SHAPIRO, P.J., and M. J. KELLY and O'BRIEN, JJ., affirmed the trial court's termination decision in an unpublished per curiam opinion issued on May 10, 2018 (Docket Nos. 340117 and 340118), concluding that *In re Hatcher*, 443 Mich 426 (1993), prohibited it from considering respondents' claim that the trial court violated their due-process rights by failing to advise them of the consequences of their pleas.  The panel also held that any error from the court's visit to the family home did not violate respondents' due-process rights and that respondents waived the claim that the court's *in camera* interview was

erroneous. Respondents applied for leave to appeal in the Supreme Court, which ordered and heard oral argument on whether to grant the application or take other action. 502 Mich 906 (2018).

In an opinion by Chief Justice MCCORMACK, joined by Justices VIVIANO, BERNSTEIN, and CLEMENT, the Supreme Court, in lieu of granting leave to appeal, *held*:

*In re Hatcher*, 443 Mich 426 (1993), which generally barred a parent from raising errors from the adjudicative phase of a child protective proceeding in the parent's appeal from an order terminating his or her parental rights, was overruled. An appeal of an adjudication error in an appeal from an order terminating parental rights is not a collateral attack because although a child protective proceeding has two distinct phases—the adjudication and the disposition—the proceeding itself is one action, not two separate actions. Therefore, the collateral-bar rule does not apply within one child protective case. Also, the use of unrecorded, *in camera* interviews of children in termination-of-parental-rights proceedings violates parents' due-process rights.

1. Under MCR 3.961(A), a proceeding to terminate parental rights begins when the Department petitions the family division of a circuit court to take jurisdiction over a child. The trial court then holds a preliminary hearing to determine whether the court may exercise jurisdiction over the child. If the court authorizes the petition, the adjudicative phase begins, in which the court determines whether it may exercise jurisdiction over the child and the respondents-parents under MCL 712A.2(b) so that it can enter dispositional orders. Once the court's jurisdiction is established, the case moves to the dispositional phase, in which the court holds review hearings to determine whether the petition should be dismissed or whether the parents' parental rights should be terminated. *Hatcher*, 443 Mich 426, generally barred a parent from raising errors from the adjudicative phase of a child protective proceeding in the parent's appeal from an order terminating his or her parental rights. *Hatcher* made a foundational mistake by erroneously applying the rule from *Jackson City Bank & Trust Co v Fredrick*, 271 Mich 538 (1935)—that a court's exercise of jurisdiction cannot be collaterally attacked in a second proceeding—to what is a single, continual proceeding. The "collateral bar" rule generally prohibits a litigant from indirectly attacking a prior judgment in a later, *separate* action, unless the court that issued the prior judgment lacked jurisdiction over the person or subject matter in the first instance. *Hatcher* applied that rule to conclude that a respondent who appeals a defect in the adjudicative phase at the end of the child protective proceeding (in an appeal from an order terminating parental rights) is "collaterally" attacking that very same child protective proceeding. But that holding failed to recognize that a child protective proceeding is a single, continual proceeding that begins with a petition, proceeds to an adjudication, and—unless the family has been reunified—ends with a determination of whether a respondent's parental rights will be terminated. Therefore, *Hatcher* was wrongly decided.

2. That a case was wrongly decided, by itself, does not necessarily mean that overruling it is appropriate. Courts should review whether the decision defies practical workability, whether reliance interests would work an undue hardship were the decision to be overruled, and whether changes in the law or facts no longer justify the decision. In this case, the Supreme Court's growing list of exceptions to *Hatcher* showed that its rule defied simple application, especially when a respondent's due-process rights were violated in the adjudication. *Hatcher* disrupted the careful balancing of interests in the juvenile code by preventing judicial review of meritorious claims of defects in the adjudication; a parent's only remedy under *Hatcher* was by way of an

interlocutory appeal, which disincentivized a parent from timely cooperating with the Department and further delayed a final determination. With regard to reliance interests, *Hatcher* had scant application; it merely imposed procedural limitations on a respondent's ability to challenge errors in the adjudication. Therefore, overruling *Hatcher* simply causes readjustments in litigation as opposed to practical, real-world dislocations. Finally, when considering whether changes in the law or facts no longer justify the decision, the erosion of *Hatcher*'s rule through the many exceptions to it created uncertainty and thus justified overruling it. Accordingly, *Hatcher* was overruled.

3. Parents have a fundamental right to direct the care, custody, and control of their children. Under the Due Process Clause of the Fourteenth Amendment, for a plea to constitute an effective waiver of a fundamental right, the plea must be voluntary and knowing. MCR 3.971(B)(3) and (4) require the trial court to advise a respondent on the record or in a writing that is made a part of the file of the allegations in the petition, the right to an attorney, the rights the respondent will be waiving by entering a plea, the consequences of that plea (including the possibility that the plea will be used as evidence in a proceeding to terminate parental rights), and to provide advice about the respondent's posttermination support obligations. Respondents argued that adjudication errors raised after the trial court has terminated parental rights should be reviewed for plain error. Under that standard, respondents must establish that (1) error occurred; (2) the error was "plain," i.e., clear or obvious; and (3) the plain error affected their substantial rights. Additionally, the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings. The Department agreed that plain-error review applied to respondents' claim of adjudication error, and the Department acknowledged that the first and second prongs were satisfied in this case because the court erred by failing to advise respondents of the consequences of their pleas and the rights they were giving up; those errors were plain. The third prong was satisfied because the constitutional deprivations of respondents' fundamental right to direct the care, custody, and control of JF affected the very framework within which respondents' case proceeded; therefore, the error affected respondents' substantial rights. Finally, the error seriously affected the fairness, integrity, or public reputation of judicial proceedings because the trial court did not advise respondents that they were waiving any of the rights identified in MCR 3.971(B)(3) and failed to advise the respondents of the consequences of entering their pleas as required by MCR 3.971(B)(4). The trial court's order of adjudication therefore had to be vacated.

4. The propriety of a trial court conducting an *in camera* interview of the subject child in the context of child protective proceedings was an issue of first impression in Michigan. In this case, respondents' agreement to the general idea of the court speaking to JF did not waive their right to have that interview comport with due process. Respondents endorsed only the court's initial proposal that the court wished to speak with JF, but the court never sought—and respondents never gave—their agreement about how that conversation would take place. There was nothing in the juvenile code, caselaw, court rules, or otherwise that permitted a trial court presiding over a termination proceeding to conduct *in camera* interviews of children for purposes of determining their best interests. Therefore, the Court of Appeals correctly held that the use of unrecorded, *in camera* interviews in termination proceedings violates parents' due-process rights. On remand, a different judge must preside.

Trial court order terminating respondents' parental rights vacated; trial court order of adjudication vacated; case remanded to the trial court for further proceedings with a different judge presiding on remand.

Justice MARKMAN, joined by Justice ZAHRA, dissenting, would not have overruled *Hatcher* because it was correctly decided and no sound reason to alter its common-law rule was presented. Justice MARKMAN would have affirmed the judgment of the Court of Appeals because the Court of Appeals correctly held that respondents cannot collaterally attack the instant adjudication after their parental rights have been terminated, that respondents waived the issue pertaining to the interview of the child, and that any error on the trial court's part in visiting respondents' home was harmless. In this case, although the trial court breached MCR 3.971 by failing to advise respondents of their rights, respondents failed to timely raise this issue. Respondents did not appeal the adjudication until after the trial court had terminated their parental rights, nearly two years after the adjudication. An adjudication cannot be collaterally attacked following an order terminating parental rights unless the termination occurred at the initial disposition; however, in this case, the adjudication and the termination were separated by a lengthy period of attempts at reunification and, therefore, respondents were barred from collaterally attacking the adjudication. The majority was incorrect in failing to recognize that although there is only one final order in a child protective case, there are at least two orders that are appealable by right, i.e., the initial dispositional order and the order terminating parental rights. The time to directly attack the adjudication is following the order of disposition placing a minor under supervision of the court. *Black's Law Dictionary* (6th ed) defines "collateral attack" as "[a]n attack on a judgment in any manner other than by action or proceeding, whose very purpose is to impeach or overturn the judgment; or, stated affirmatively, a collateral attack on a judgment is an attack made by or in an action or proceeding that has an independent purpose other than impeaching or overturning the judgment." An order terminating parental rights has an independent purpose other than overturning the adjudication—to attack the termination. Therefore, attacking the adjudication in the appeal of the termination order constitutes a collateral—rather than a direct—attack. The collateral-attack rule is a common-law rule, and when it comes to alteration of the common law, the traditional rule must prevail absent compelling reasons for change. The majority failed to set forth a reason, let alone a compelling reason, to justify its alteration of *Hatcher*'s common-law rule. Contrary to the majority's assertion, numerous "exceptions" to the *Hatcher* rule have not been carved out.

Furthermore, the court rules were recently amended to essentially incorporate *Hatcher*; specifically, the court rules now require the trial court to advise parents that they have an appeal of right from the initial dispositional order and that if they do not challenge the adjudication at that point, they will not be able to challenge it after their parental rights have been terminated, with two exceptions. Given that this Court just incorporated *Hatcher* into its court rules, Justice MARKMAN was not sure why the majority felt compelled to overrule it in its opinion. In addition, Justice MARKMAN would not overrule *Hatcher* because finality is critical with regard to child protective proceedings. Allowing a "do-over" is not fair to the children who will be required to endure this process again—or to prospective adoptive parents—and it further results in wasted time, money, and resources as well as disrupts whatever progress and rehabilitation the children might have made during that time. Just as the new court rules reasonably balance the rights of parents and children, and afford a clear opportunity for a fresh start for the abused or neglected child, so too did the prior court rules. It is not right that JF *alone* should be made subject to a *third*

court rule regime, which does not reasonably balance the interests of parent and child and requires a lengthy re-do of an already lengthy and fair legal process only because of the failure of respondents—already deemed by a court of law to have acted neglectfully—to have abided by the law in pursuing a timely appeal. Thus, in a realm of the law in which reasonable expedition of decision-making has always been thought by the judiciary to be paramount, the majority imposes in this single case a process that is reflective of our legal system at its most unnecessarily drawn out and dilatory.

Justice CAVANAGH did not participate in the disposition of this case because the Court considered it before she assumed office.

©2019 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED June 12, 2019

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* FERRANTI, Minor.

No. 157907

BEFORE THE ENTIRE BENCH (except CAVANAGH, J.)

McCORMACK, C.J.

This Court's decision in *In re Hatcher*, 443 Mich 426; 505 NW2d 834 (1993), generally bars a parent from raising errors from the adjudicative phase of a child protective proceeding in the parent's appeal from an order terminating his or her parental rights. The *Hatcher* rule rests on the legal fiction that a child protective proceeding is two separate actions: the adjudication and the disposition. With that procedural (mis)understanding, we held that a posttermination appeal of a defect in the adjudicative phase is prohibited because it is a collateral attack. This foundational assumption was wrong; *Hatcher* was wrongly decided, and we overrule it.

The *Hatcher* rule prevented these respondents-parents from challenging the undisputed defects in their pleas—the pleas that supported the trial court's exercise of dispositional authority and the termination of the respondents' parental rights. We reverse the Court of Appeals, vacate the trial court's order of adjudication and order terminating the respondents' parental rights, and remand this case to the trial court for further proceedings. And because the trial court violated the respondents' due-process rights by conducting an unrecorded, *in camera* interview of the subject child before the court's resolution of the termination petition, a different judge must preside on remand.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondents have several children together. Their youngest, a daughter, JF, was born in 2003. JF has spina bifida, a birth defect relating to the gestational development of the spinal cord. As a result of her spina bifida, JF has trouble ambulating without the aid of a mobility device. Also related to spina bifida, JF has neurogenic bladder, and she must use a catheter to urinate. JF has required medical care and supervision for her entire life.

In October 2015, the petitioner, the Department of Health and Human Services (the Department), petitioned to remove JF from the respondents' care. The Department alleged that the respondents had failed to adequately attend to JF's medical needs by missing several medical appointments and failing to regularly refill her prescription medications. The Department also alleged that the living conditions in the respondents' home posed a health risk to JF. The petition described the respondents' home as having "clutter throughout," making it difficult to maneuver in a wheelchair. The petition also described JF's bathroom as "filthy" and the home as having "a strong odor of animals and urine."

2

The court held an emergency hearing on the petition and placed JF in foster care, but the court permitted her to have unsupervised visits at the respondents' home. After several more hearings, the trial court found probable cause to authorize the petition and set an adjudication trial.

At a preadjudication status conference in December 2015, the respondents admitted that JF had been prescribed medications for her health condition, that they had not refilled several of JF's prescriptions since January 2015, and that some of those prescriptions could have been refilled at no cost. These admissions allowed the trial court to exercise jurisdiction over JF. The respondents made no other admissions.

In taking the respondents' pleas, the court did not advise them that they were waiving any rights. Nor did the court advise them of the consequences of their pleas, as required by our court rules. See MCR 3.971.[1] And although it was not required to do so

---

[1] MCR 3.971 is to be amended on the date this opinion is issued. MCR 3.971 previously provided, in part:

> (B) Advice of Rights and Possible Disposition. Before accepting a plea of admission or plea of no contest, the court must advise the respondent on the record or in a writing that is made a part of the file:
>
> (1) of the allegations in the petition;
>
> (2) of the right to an attorney, if respondent is without an attorney;
>
> (3) that, if the court accepts the plea, the respondent will give up the rights to
>
> (a) trial by a judge or trial by a jury,
>
> (b) have the petitioner prove the allegations in the petition by a preponderance of the evidence,

3

by our court rules, the court did not advise the respondents that they could appeal its decision to take jurisdiction over JF.

_____

(c) have witnesses against the respondent appear and testify under oath at the trial,

(d) cross-examine witnesses, and

(e) have the court subpoena any witnesses the respondent believes could give testimony in the respondent's favor;

(4) of the consequences of the plea, including that the plea can later be used as evidence in a proceeding to terminate parental rights if the respondent is a parent.

(5) if parental rights are subsequently terminated, the obligation to support the child will continue until a court of competent jurisdiction modifies or terminates the obligation, an order of adoption is entered, or the child is emancipated by operation of law. Failure to provide required notice under this subsection does not affect the obligation imposed by law or otherwise establish a remedy or cause of action on behalf of the parent.

(C) Voluntary, Accurate Plea.

(1) Voluntary Plea. The court shall not accept a plea of admission or of no contest without satisfying itself that the plea is knowingly, understandingly, and voluntarily made.

(2) Accurate Plea. The court shall not accept a plea of admission or of no contest without establishing support for a finding that one or more of the statutory grounds alleged in the petition are true, preferably by questioning the respondent unless the offer is to plead no contest. If the plea is no contest, the court shall not question the respondent, but, by some other means, shall obtain support for a finding that one or more of the statutory grounds alleged in the petition are true. The court shall state why a plea of no contest is appropriate.

The amended rule does not alter this language. But the language that had appeared in MCR 3.971(C) will now appear in MCR 3.971(D), the revised rule contains new language at MCR 3.971(C), and MCR 3.971(B) will contain additional subparts. Further references in this opinion to MCR 3.971(C) are to the language quoted in this footnote.

4

At the initial dispositional hearing held on January 12, 2016, the trial court adopted the family treatment plan proposed by the Department. That plan required the respondents to complete psychological examinations, maintain a clean home, and attend all of JF's scheduled medical appointments. The court's initial dispositional order maintained JF's placement in foster care and continued to allow JF to have unsupervised visits with the respondents at the family home.

As discussed, the Department's initial assessment of the home (as alleged in the petition) was that it posed a health risk unique to JF because her bladder catheterization was susceptible to infection. But at a preadjudication hearing held shortly after the Department filed its petition, JF's lawyer-guardian ad litem (LGAL) described the respondents' home as "habitable" and "suitable" for JF.[2] And although the respondents' treatment plan required them to maintain a clean home, neither the parties nor the court focused on this issue at the first two dispositional review hearings in April and July 2016.[3] But at the third and final dispositional hearing in October 2016, the parties disputed the home's suitability for JF.

The trial court concluded the October hearing by authorizing the Department to file a termination petition, but the court noted that its decision was limited to that procedural

---

[2] The trial court had instructed the LGAL to inspect the respondents' home at the initial emergency hearing on the petition.

[3] The respondents successfully completed other aspects of the treatment plan. The respondents underwent court-ordered psychological evaluations. Those evaluations determined that neither respondent posed a significant risk of physical or emotional abuse to JF. The psychologist reported that many of the alleged parenting failures were attributable to a lack of scheduling and organization. And the Department acknowledged at the permanency planning hearing that the respondents had attended all of JF's medical appointments, in accordance with the treatment plan.

step.  The court was troubled by the conflicting testimony about the condition of the home and stated that it wanted to see the home for itself.  And the court did that in February 2017.  While the record shows that the respondents' attorneys and the LGAL were present when the court visited the family home, the court did not document its observations and factual findings.  The respondents' attorneys were prohibited from addressing the court during the visit.

The court conducted the termination hearing over three days in May, June, and July 2017.  After the June hearing date, the court stated that it was "inclined to speak with [JF]" and invited objections from counsel.  When the hearing resumed in July, the court announced that it had conducted an *in camera* interview with JF.  The court made no record of its conversation with JF.

The court terminated the respondents' parental rights, citing two statutory grounds for termination: MCL 712A.19b(3)(c)(*i*)[4] and MCL 712A.19(3)(g).[5]  The court determined that both grounds were satisfied by clear and convincing evidence because of the "very unhygienic household circumstance, and a lack of or inability to create hygienic conditions . . . ."  In its analysis of the child's best interests, the court explained that the

---

[4] MCL 712A.19b(3)(c)(*i*) allows the court to terminate a parent's parental rights if "182 or more days have elapsed since the issuance of an initial dispositional order, and the court . . . finds [that] [t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

[5] MCL 712A.19b(3)(g) allows the court to terminate a parent's parental rights if "[t]he parent . . . fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age."

home environment "is not as atrociously bad as it was, but even when the Court viewed the situation, it is not where a person with Spinal [sic] Bifida will thrive."

The respondents appealed. They challenged the trial court's jurisdiction to terminate their parental rights because of the defects in their pleas, and they challenged the trial court's ability to fairly decide the termination decision (and the respondents' ability to challenge that decision on appeal) as a result of the court's unrecorded visit to the family home and the *in camera* interview with JF. The Court of Appeals affirmed the trial court's termination decision in an unpublished opinion. *In re Ferranti*, unpublished per curiam opinion of the Court of Appeals, issued May 10, 2018 (Docket Nos. 340117 and 340118). The panel concluded that our holding in *Hatcher* prohibited it from considering the respondents' claim that the trial court violated their due-process rights by failing to advise them of the consequences of their pleas. *Ferranti*, unpub op at 6. The panel also held that any error from the visit to the family home did not violate the respondents' due-process rights, *id*. at 8, and that the respondents waived the claim that the court's *in camera* interview was error, *id*. at 9.

The respondents sought leave to appeal in this Court. We granted oral argument on the application and directed the parties to address these issues:

(1) whether this Court's opinion in *In re Hatcher*, 443 Mich 426 (1993), correctly held that the collateral attack rule applied to bar the respondent-parents from challenging the court's initial exercise of jurisdiction over the respondents on appeal from an order terminating parental rights in that same proceeding; (2) if not, (a) by what standard should courts review the respondents' challenge to the initial adjudication, in light of the respondents' failure to appeal the first dispositional order appealable of right, see MCR 3.993(A)(1), and (b) what must a respondent do to preserve for appeal any alleged errors in the adjudication, see e.g., *In re Hudson*, 483 Mich 928 (2009); (3) if *Hatcher* was correctly decided, whether due process concerns may override the collateral bar rule, see, *In re Sanders*, 495 Mich 394 (2014),

7

and *In re Wangler*, 498 Mich 911 (2015); (4) whether a trial court is permitted to visit a respondent's home to observe its condition, and, if so, what parameters should apply to doing so; and (5) whether a trial court may interview a child who is the subject of child protective proceedings in chambers, and, if so, what parameters should apply to doing so. [*In re Ferranti*, 502 Mich 906, 906 (2018).]

## II. LEGAL BACKGROUND

We review the interpretation and application of statutes and court rules de novo. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). Whether child protective proceedings complied with a parent's right to due process presents a question of constitutional law, which we also review de novo. *Id*. at 403-404. De novo review means we review this issue independently, with no required deference to the courts below.

### A. CHILD PROTECTIVE PROCEEDINGS IN MICHIGAN

Child protective proceedings are governed by the juvenile code, MCL 712A.1 *et seq*., and Subchapter 3.900 of the Michigan Court Rules. Any person who suspects child abuse or neglect may report their concerns to the Department. MCL 712A.11(1). The Department, after conducting a preliminary investigation, may then petition the Family Division of the circuit court to take jurisdiction over the child. MCR 3.961(A). That petition must contain, among other things, "[t]he essential facts" that, if proven, would allow the trial court to assume jurisdiction over the child. MCR 3.961(B)(3); see also MCL 712A.2(b). After receiving the petition, the trial court must hold a preliminary hearing and may authorize the filing of the petition upon a finding of probable cause that one or more

of the allegations are true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b). See MCR 3.965(B).[6]

If the court authorizes the petition, the adjudication phase follows. The question at adjudication is whether the trial court can exercise jurisdiction over the child (and the respondents-parents) under MCL 712A.2(b) so that it can enter dispositional orders, including an order terminating parental rights. See *Sanders*, 495 Mich at 405-406. The court can exercise jurisdiction if a respondent-parent enters a plea of admission or no contest to allegations in the petition, see MCR 3.971, or if the Department proves the allegations at a trial, see MCR 3.972. "If a trial is held, the respondent is entitled to a jury, the rules of evidence generally apply, and the petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *Sanders*, 495 Mich at 405 (citations omitted). And "[w]hile the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *Id*. at 405-406 (quotation marks, citation, and brackets omitted). The adjudication divests the parent of her constitutional right to parent her child and gives the state that authority instead.

Once the trial court's jurisdiction is established, the case moves to the dispositional phase. In this phase, the trial court has "broad authority" to enter orders that are " 'appropriate for the welfare of the juvenile and society in view of the facts proven and

---

[6] If the child is not in protective custody and the petition does not request placement outside the family home, then a preliminary hearing is not required. Instead, the probable-cause determination (and the appropriate course of action) is made through a preliminary inquiry, a comparatively less formal process. See MCR 3.962.

ascertained.' " *Id.* at 406, quoting MCL 712A.18(1). During the dispositional phase the court must hold review hearings "to permit court review of the progress made to comply with any order of disposition and with the case service plan [i.e., the family treatment plan] . . . and court evaluation of the continued need and appropriateness for the child to be in foster care." MCR 3.975(A). If the child is removed from the family home, the court must conduct a permanency planning hearing within 12 months from the date of removal. MCL 712A.19a(1); MCR 3.976(B)(2). This hearing results in either the dismissal of the petition and family reunification, or the court ordering the Department to petition for the termination of parental rights. MCL 712A.19a(4); MCR 3.976(A).

If the Department files a termination petition, the court holds a termination hearing. See MCR 3.977. The court acts as fact-finder, MCR 3.977(I), and the rules of evidence generally do not apply, MCR 3.977(H)(2). If the court determines by clear and convincing evidence that one or more statutory grounds for termination exist, see MCL 712A.19b(3), the court must enter an order terminating the respondents' parental rights unless the court determines that termination is clearly not in the child's best interests. *In re Trejo*, 462 Mich 341, 344; 612 NW2d 407 (2000).

## B. *IN RE HATCHER*

In *Hatcher*, 443 Mich at 428, we considered whether a respondent-parent may challenge the trial court's "assumption of subject matter jurisdiction over a minor child . . . after a termination decision and, if so, whether the entire termination proceedings should be declared void ab initio." Or more simply: whether a parent could challenge errors in the adjudication when appealing the termination of his or her parental rights.

10

The *Hatcher* trial court authorized the filing of a petition and placement of the child with the grandmother after conducting a preliminary hearing that neither parent attended. *Id*. at 429. At the adjudication, both parents stipulated to the court's jurisdiction over their child, but they did not testify to or admit any facts that would support that jurisdiction. *Id*. at 430; see MCL 712A.2(b). The court held three dispositional hearings before the permanency planning hearing; neither parent challenged the court's jurisdiction at those hearings. *Id*. at 430-431. Following the permanency planning hearing, the trial court terminated both parents' rights. The father appealed, challenging the court's adjudication. He argued, and the Court of Appeals agreed, that "the termination proceedings were void ab initio, [and] that the [trial] court never assumed valid subject matter jurisdiction over the child," because neither parent ever admitted to facts supporting a statutory basis for jurisdiction. *Id*. at 432; see *In re Waite*, 188 Mich App 189, 208; 468 NW2d 912 (1991); *In re Nelson*; 190 Mich App 237, 241-242; 475 NW2d 448 (1991).

We reversed. We held that the father's claim of error (the adjudication-by-stipulation) did not deprive the court of subject matter jurisdiction but "address[ed] the procedure by which the probate court proceeded *after* it had established subject matter jurisdiction on the basis of a validly filed petition." *Hatcher*, 443 Mich at 438 (emphasis added). We explained:

> [T]he probate court's subject matter jurisdiction is established when the action is of a class that the court is authorized to adjudicate, and the claim stated in the complaint is not clearly frivolous. The valid exercise of the probate court's statutory jurisdiction is established by the contents of the petition after the probate judge or referee has found probable cause to believe that the allegations contained within the petitions are true. . . . When the referee considered the facts alleged in the petition and the testimony presented, he found probable cause that the allegations were true. Consequently, it was proper for the court to invoke its jurisdiction, assuming

11

the court also had jurisdiction of the parties, a fact not here in dispute. Procedural errors that may have occurred did not affect the probate court's subject matter jurisdiction.

Although neither the mother nor the father stipulated facts that supported the court's jurisdiction, this jurisdiction is initially established by pleadings, such as the petition, rather than by later trial proceedings that may establish by a preponderance of the evidence that a child is within the continued exercise of the probate court's subject matter jurisdiction. [*Id*. at 437-438.]

Again, more simply: *Hatcher* held that the trial court's error did not deprive it of subject matter jurisdiction—it was simply an adjudicative error. And the father could not appeal that error; he should have either appealed the order authorizing the filing of the petition[7] or challenged the issue at a dispositional hearing. *Id*. at 438 ("The respondent could have appealed the court's exercise of its statutory jurisdiction by challenging the sufficiency of the petition . . . . Alternatively, he could have pursued a number of statutory proceedings designed to redress an erroneous exercise of jurisdiction."), citing MCL 712A.19; MCL 712A.21. Because he did neither, we prohibited his termination challenge, calling it a "collateral attack." *Id*. at 444 ("Our ruling today severs a party's ability to challenge a probate court decision years later in a collateral attack where a direct appeal was available."). That characterization was novel and inconsistent with our collateral-attack jurisprudence.[8]

---

[7] It is unclear why the *Hatcher* Court viewed a challenge to the sufficiency of the petition as a suitable means for redressing the father's claim of error in the adjudication—the trial court's failure to establish by plea or trial any of the statutory bases for jurisdiction set forth at MCL 712A.2(b). The error in the adjudication occurred *after* the preliminary hearing, when the probable-cause determination was made; the father could not have appealed an error that had yet to occur.

[8] *Hatcher* overturned this Court's decision in *Fritts v Krugh*, 354 Mich 97; 92 NW2d 604 (1958). *Fritts*, *id*. at 115, had permitted a challenge to a termination order in a writ of

12

Later decisions summarized the rule from *Hatcher* as barring a respondent-parent from challenging errors in the adjudicative phase in an appeal from an order terminating the respondent's parental rights, unless the termination of rights occurs at the initial dispositional hearing. See *In re SLH*, 277 Mich App 662, 668-669; 747 NW2d 547 (2008).[9]

---

habeas corpus, a separate and collateral action from the child protective proceeding that resulted in termination. A brief detour about *Fritts* is in order, because it gives some context to *Hatcher*. While the *Fritts* Court found that the initial petition sufficiently alleged jurisdictional facts, and the trial court therefore "had jurisdiction . . . for purposes of hearing the neglect complaint," *id*. at 111, the Court still concluded that the trial court lacked (or had been divested of) jurisdiction to terminate the petitioners' parental rights because of insufficient factual support for the allegations in the complaint (petition), *id*. at 115; see MCL 712A.2(b)(1). And while *Fritts* was a collateral attack on the trial court's termination order, the Court acknowledged that the petitioners' challenge was not based on a lack of personal or subject matter jurisdiction, *id*. at 120-121, but some other (and it seems, broader) concept of jurisdiction, *id*. at 122 ("We hold that the orders entered upon the record of this hearing . . . represented an erroneous concept of the power conveyed by statute upon the probate court sitting in juvenile division, and that, being based upon no evidence of permanent neglect, they represented a fundamental miscarriage of justice as to these petitioners and exceeded the statutory powers of the probate judge who entered them."). *Fritts* was a true collateral attack; the dissent recognized this and criticized the *Fritts* majority for allowing "the use of the writ of habeas corpus as a substitute for statutory appeal . . . ." *Id*. at 145 (BLACK, J., dissenting) (quotation marks and citation omitted).

Here, as in *Hatcher*, there is no collateral proceeding—the respondents' arguments are on direct appeal from the order of termination. So while the *Hatcher* Court's desire to overrule *Fritts*'s procedurally anomalous holding—that a termination order can be (truly) collaterally attacked—is understandable, see *Hatcher*, 443 Mich at 444 ("Our ruling today severs a party's ability to challenge a probate court decision years later in a collateral attack where a direct appeal was available."), and its criticism of *Fritts*'s substantive jurisdictional holding is also sound, see *id*. at 440-443, *Hatcher* was *not* a collateral attack. It was a direct appeal of an (unpreserved) adjudicative error.

[9] In *SLH*, 277 Mich App at 668, the Court of Appeals explained that *Hatcher* has no application when termination is sought in a petition filed before the adjudication, because "an adjudication cannot be collaterally attacked . . . [unless] a termination occurs following the filing of a supplemental petition for termination after the issuance of the initial dispositional order." (Cleaned up.)

13

## III. ANALYSIS

### A. RESPONDENTS' ADJUDICATORY PLEAS AND *IN RE HATCHER*

The respondents believe that their due-process rights were violated because their pleas were not knowingly and voluntarily made. They object to the trial court's failure to inform them that they had a right to a jury trial on the allegations in the petition, at which the Department would have to prove those allegations by a preponderance of the evidence and the respondents would be permitted to call their own witnesses and cross-examine those produced by the Department. The respondents also fault the trial court for its failure to advise them that their pleas could later be used as evidence to terminate their parental rights. And about *Hatcher*, the respondents argue that it was wrongly decided because it misunderstood child protective proceedings. We agree.

The respondents have a fundamental right to direct the care, custody, and control of JF. See *Sanders*, 495 Mich at 415. And the Due Process Clause of the Fourteenth Amendment requires that, for a plea to constitute an effective waiver of a fundamental right, the plea must be voluntary and knowing. See *In re Wangler*, 498 Mich 911, 911 (2015) (stating that "the manner in which the trial court assumed jurisdiction violated the respondent-mother's due process rights" because the trial court failed to follow MCR 3.971(C)(1) and (2) before accepting the respondent's adjudicatory plea); see also *People v Cole*, 491 Mich 325, 332-333; 817 NW2d 497 (2012) ("For a plea to constitute an effective waiver of . . . rights, the Due Process Clause of the Fourteenth Amendment requires that the plea be voluntary and knowing.").

Our court rules reflect this due-process guarantee. MCR 3.971(C)(1) demands that the trial court ensure that a respondent's plea be knowingly, understandingly, and

14

voluntarily made before the court can accept it.  And MCR 3.971(B) requires the trial court to advise the respondent, "on the record or in a writing that is made a part of the file," of the allegations in the petition, the right to an attorney, the rights the respondent will be waiving by entering a plea, the consequences of that plea (including the possibility that the plea will "be used as evidence in a proceeding to terminate parental rights," MCR 3.971(B)(4)), and to provide advice about the respondent's posttermination support obligations.

The Department concedes that the trial court did not comply with these rules, violating the respondents' due-process rights.  *Wangler*, 498 Mich at 911.  Recognizing that *Hatcher* would bar them from appealing this claim of error, the respondents ask us to revisit our decision in *Hatcher* and either overrule it or carve out (yet another) exception to its collateral-bar rule when application would prevent a respondent from vindicating a due-process violation.

*Hatcher* made a foundational mistake; it erroneously applied the rule from *Jackson City Bank & Trust Co v Fredrick*, 271 Mich 538; 260 NW 908 (1935)—that a court's exercise of jurisdiction cannot be collaterally attacked in a second proceeding—to what is a single, continual proceeding.

In *Jackson City Bank*, 271 Mich at 544-545, we explained that

> [w]hen there is a want of jurisdiction over the parties, or the subject-matter, no matter what formalities may have been taken by the trial court, the action thereof is void because of its want of jurisdiction, and consequently its proceedings may be questioned collaterally as well as directly.  They are of no more value than as though they did not exist.  But in cases where the court has undoubted jurisdiction of the subject matter, and of the parties, the action of the trial court, though involving an erroneous exercise of jurisdiction, which might be taken advantage of by direct appeal, or by direct attack, yet the judgment or decree is not void though it might be set aside for the

15

irregular or erroneous exercise of jurisdiction if appealed from. It may not be called in question collaterally.

Put differently, the "collateral bar" rule generally prohibits a litigant from indirectly attacking a prior judgment in a later, *separate* action, unless the court that issued the prior judgment lacked jurisdiction over the person or subject matter in the first instance. See *In re Ives*, 314 Mich 690, 696; 23 NW2d 131 (1946). Instead, the litigant must seek relief by reconsideration of the judgment from the issuing court or by direct appeal.[10]

*Hatcher* applied the collateral-bar rule to conclude that a respondent who appeals a defect in the adjudicative phase at the end of the child protective proceeding (in an appeal from an order terminating parental rights) is "collaterally" attacking that very same child protective proceeding. But that holding failed to recognize that "[a] child protective proceeding is 'a single continuous proceeding' " that begins with a petition, proceeds to an adjudication, and—unless the family has been reunified—ends with a determination of whether a respondent's parental rights will be terminated. *In re Hudson*, 483 Mich 928, 935 (2009) (CORRIGAN, J., concurring), quoting *In re LaFlure*, 48 Mich App 377, 391; 210 NW2d 482 (1973).

Collateral-bar jurisprudence makes the *Hatcher* Court's mistake obvious. The rule bars a litigant from challenging a ruling or judgment in a later and separate case. Thus, in

---

[10] *Jackson City Bank*'s general rule prohibiting collateral attacks on a court's final judgment is well settled and common across jurisdictions. See *Hazel-Atlas Glass Co v Hartford-Empire Co*, 322 US 238, 244; 64 S Ct 997; 88 L Ed 1250 (1944) ("Federal courts, both trial and appellate, long ago established the general rule that they would not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered. . . . This salutary general rule springs from the belief that in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered.").

16

*Jackson City Bank*, 271 Mich at 546, we held that the plaintiffs, heirs of the defendant's deceased second husband, were barred from asserting claims that challenged the validity of the defendant's divorce from her first. The other cases *Hatcher* cited agree. See *Life Ins Co of Detroit v Burton*, 306 Mich 81, 84-85; 10 NW2d 315 (1943) (defendant-surety barred from seeking reformation of a surety bond in a later collection action brought by the plaintiff-creditor); *Edwards v Meinberg*, 334 Mich 355; 54 NW2d 684 (1952) (error in venue did not divest the issuing court of subject matter jurisdiction, so the plaintiff was barred from asserting that the earlier judgment against him was invalid). In all these cases, the party seeking to challenge the earlier ruling or judgment did so in a separate, later proceeding (and even in a different forum).

Nor did *Hatcher* explain its novel application of the rule. The *Hatcher* Court held that the trial court's error in the adjudication did not deprive the court of subject matter jurisdiction, as the Court of Appeals thought, but merely affected "the procedure by which the probate court proceeded after it had established subject matter jurisdiction on the basis of a validly filed petition." *Hatcher*, 443 Mich at 438. So far, so good. But *Hatcher*'s next step is unexplained; it went on to apply the collateral-bar rule from *Jackson City Bank* to bar appellate review of the error with no reasoning to make understandable why appealing the claim of error in the adjudication amounted to a collateral attack.

More confusing still, the Court's prescription for what the respondent-father should have done contradicts its conclusion. The Court reasoned that the father could have raised the adjudication error at one of the dispositional review hearings or even in a motion for

17

rehearing from the order terminating parental rights. *Id*. at 436.[11] But this rationale conflicts with the Court's conclusion that his appeal raising that same claim amounted to a collateral attack. True, a party's failure to timely assert a right in the trial court generally means that any resulting error will be treated as "unpreserved" if challenged on appeal. See *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999); *People v Grant*, 445 Mich 535; 520 NW2d 123 (1994). But issue preservation dictates the appellate standard of review; it does not transform direct review into collateral attack. See *Carines*, 460 Mich at 761-764 (discussing the plain-error doctrine).

*Hatcher* was wrongly decided.

But we don't disrupt precedent whenever that's the case. We have to consider whether *Hatcher*'s precedential value compels us to retain its rule of decision under the principles of stare decisis. *Coldwater v Consumers Energy Co*, 500 Mich 158, 172; 895 NW2d 154 (2017) (stating that the mere fact that "a case was wrongly decided, by itself, does not necessarily mean that overruling it is appropriate"). The stare decisis analysis should not be " 'applied mechanically,' " *id*. at 173 (citation omitted), but generally we consider these principles: "whether the decision defies practical workability, whether reliance interests would work an undue hardship were the decision to be overruled, and whether changes in the law or facts no longer justify the decision," *id*.

This Court's growing list of "exceptions" to *Hatcher* deserves emphasis at the front end of this analysis. See, e.g., *Sanders*, 495 Mich 394 (reversing a termination in which

---

[11] The Court also reasoned that the father could have challenged the sufficiency of the petition or the probable-cause determination. *Hatcher*, 443 Mich at 438. But as discussed above at note 7, those procedural steps occurred well before the trial court's error.

one parent was improperly adjudicated as unfit and holding that the one-parent doctrine is unconstitutional); *In re Mays*, 490 Mich 993 (2012) (reversing a termination after the trial court made an erroneous factual finding during the adjudication phase); *In re Mason*, 486 Mich 142; 782 NW2d 747 (2010) (reversing a termination based on the failure to facilitate the respondent's involvement and participation during the adjudication and dispositional phases); *In re Hudson*, 483 Mich 928 (remanding when the trial court failed to advise the respondent that her plea could be used to terminate her parental rights); *In re Mitchell*, 485 Mich 922 (2009) (same); *In re Jones*, 499 Mich 862 (2016) (reversing a parental termination order after the Court of Appeals held that the respondent's claims were barred by *Hatcher*); *Wangler*, 498 Mich at 911 (same). While we overrule *Hatcher* only now, if these exceptions haven't fully swallowed the rule, it is surely most of the way through the chewing process. The resulting disruption affects our analysis of each of the stare decisis principles. To those now.

First, a rule of decision defies practical workability if it has proved difficult to apply or implement. See, e.g., *Montejo v Louisiana*, 556 US 778, 792; 129 S Ct 2079; 173 L Ed 2d 955 (2009). On first blush, *Hatcher* might appear easy to apply—an appellate court reviewing a termination decision should simply reject any claims relating to the adjudication. But that has not been our experience. Instead, the number of exceptions to *Hatcher* is good evidence that its rule defies simple application, especially when a respondent's due-process rights are violated in the adjudication. And if history is our guide, trying to craft yet another exception to *Hatcher* here will not end the matter. This factor does not favor keeping *Hatcher*.

19

We also consider reliance interests, including "whether reliance interests would work an undue hardship were the decision to be overruled . . . ." *Coldwater*, 500 Mich at 173. The question is "whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Id.* (quotation marks and citation omitted). *Hatcher* has scant application; it just imposes procedural limitations on a respondent's ability to challenge errors in the adjudication. Given this, overruling *Hatcher* would not cause "practical, real-world dislocations" but simply "readjustments" in litigation.

The litigants and practitioners who had to decide whether to raise a claim of error within the procedural restrictions of *Hatcher* had little stability, given our growing exceptions to it. And lawyers and litigants are not similarly situated. Lawyers know both about trial court error and *Hatcher*'s rule (and its exceptions), but litigants are likely aware of neither. Take this case: the trial court's error meant that the respondents were never told what rights they were giving up, nor were they advised that they couldn't appeal the due-process violation that resulted from their defective plea unless they did so immediately.

Finally, we consider whether changes in the law or facts no longer justify the decision. See *Coldwater*, 500 Mich at 174. Our growing list of *Hatcher* cutouts favors overruling it. Continuing *Hatcher*'s death by a thousand cuts would leave litigants and courts unsure of whether they can appeal an adjudicative error in an appeal from an order terminating parental rights. The erosion of the rule by its exceptions has created uncertainty; we should be providing clarity.

Rather than create yet another exception to *Hatcher*, we overrule it. We are mindful of the finality concerns that motivated the Court's decision to adopt the rule. See *Hatcher*, 443 Mich at 444 (explaining that the Court's holding would "provide repose to [those] who rely upon the finality of probate court decisions").[12] But we must balance the interest in finality against the Legislature's intent as expressed in the juvenile code to support children in their own homes, see MCL 712A.1(3) ("This chapter shall be liberally construed so that each juvenile coming within the court's jurisdiction receives the care, guidance, and control, preferably in his or her own home, conducive to the juvenile's welfare and the best interest of the state."), and the protection of the constitutional rights of families. "The right to parent one's children is essential to the orderly pursuit of happiness by free men and is perhaps the oldest of the fundamental liberty interests[.]" *Sanders*, 495 Mich at 409, quoting *Meyer v Nebraska*, 262 US 390, 399-400; 43 S Ct 625; 67 L Ed 1042 (1923), and *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (opinion by O'Connor, J.) (cleaned up).

And "there will normally be no reason for the State to inject itself into the private realm of the family" because "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 US at 68. Thus, "[w]hen a child is parented by a fit parent, the state's interest in the child's welfare is perfectly aligned with the parent's liberty interest." *Sanders*, 495 Mich at 416. For that reason, it is the "[a]djudication [that] protects

---

[12] Although we overrule *Hatcher*, we agree with its criticism of *Fritts*. An error in the adjudication (the error in *Fritts*, *Hatcher*, and here) will not, as a general matter, provide a parent with grounds to collaterally attack the order of termination in a later, separate proceeding, as the Court permitted in *Fritts*. But *Hatcher*'s prescription of prohibiting direct appellate review was a misfire.

the parents' fundamental right to direct the care, custody, and control of their children, while also ensuring that the state can protect the health and safety of the children." *Id*. at 422.

But *Hatcher* disrupts the careful balancing of interests in our juvenile code by preventing judicial review of meritorious claims of defects in the adjudication. That is, it prevents review of mistakes in the government process that permanently separates a parent from a child. A parent's only remedy under *Hatcher* is by way of an interlocutory appeal, disincentivizing him or her from timely cooperating with the Department and further delaying a final determination. *Hatcher* disserves parents, their children, and the state. It's time to disavow it.

On to the merits. The parties agree that adjudication errors raised after the trial court has terminated parental rights are reviewed for plain error. See *Mitchell*, 485 Mich at 922 (reviewing for plain error the trial court's failure to timely appoint counsel for the respondent and failure to advise the respondent that his plea could later be used in a proceeding to terminate his parental rights); *Hudson*, 483 Mich at 928 (same). The respondents must establish that (1) error occurred; (2) the error was "plain," i.e., clear or obvious; and (3) the plain error affected their substantial rights. *Carines*, 460 Mich at 763. And the error must have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings[] . . . ." *Id*. (citation and quotation marks omitted; alteration in original).[13]

---

[13] The final requirement of plain-error review is also satisfied "when the plain, forfeited error resulted in the conviction of an actually innocent defendant," *Carines* 460 Mich at 763, which reflects plain error's origin as a rule of federal *criminal* procedure, see *United States v Olano*, 507 US 725; 113 S Ct 1770; 123 L Ed 2d 508 (1993); FR Crim P 52. We

22

The Department acknowledges that the first and second prongs are satisfied. Due process and our court rules require a trial court to advise respondents-parents of the rights that they will waive by their plea and the consequences that may flow from it. The court erred by failing to advise these respondents of the consequences of their pleas and the rights they were giving up; those errors were plain.

But the Department believes that the errors did not affect the respondents' substantial rights because it would have been able to prove the allegations had the case proceeded to an adjudication trial. This misses the point; the constitutional deficiencies here are not forgiven by what might have transpired at trial. The respondents' pleas were not knowingly, understandingly, and voluntarily made. *Wangler*, 498 Mich at 911 ("[W]e conclude that the trial court violated MCR 3.971(C)(1) by failing to satisfy itself that the respondent-mother's plea was knowingly, understandingly, and voluntarily made, and violated MCR 3.971(C)(2) by failing to establish support for a finding that one or more of the statutory grounds alleged in the petition were true. Therefore, the manner in which the trial court assumed jurisdiction violated the respondent-mother's due process rights.").

The respondents were deprived of their fundamental right to direct the care, custody, and control over JF based on those invalid pleas. And the invalid pleas relieved the Department of its burden to prove that the respondents were unfit at a jury trial, with all of its due-process protections. See *Sanders*, 495 Mich at 405 (explaining that in an

---

have applied *Carines*'s plain-error test in appeals from juvenile proceedings. See, e.g., *Mitchell*, 485 Mich at 922. The Court of Appeals has as well. See *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). But we did so without explanation. We apply the test here because neither party has argued for a different standard for juvenile proceedings despite the differences between these cases and criminal cases.

adjudication trial the respondent "is entitled to a jury, . . . the rules of evidence generally apply, . . . and the petitioner has the burden of [proof]"). These constitutional deprivations affected the very framework within which respondents' case proceeded. There was error, it was plain, and it affected the respondents' substantial rights. See *Mitchell*, 485 Mich at 922; *Hudson*, 483 Mich at 928.

Finally, we conclude that the error here seriously affected the fairness, integrity, or public reputation of judicial proceedings. The trial court did not advise the respondents that they were waiving any of the important rights identified in MCR 3.971(B)(3). And it failed to advise the respondents of the consequences of entering their pleas. MCR 3.971(B)(4). This failure resulted in the respondents' constitutionally defective pleas and undermined the foundation of the rest of the proceedings. The defective pleas allowed the state to interfere with and then terminate the respondents' fundamental right to parent their child. Due process requires more: either a plea hearing that comports with due process and the court rule or, if respondents choose, a trial. MCR 3.971; MCR 3.972. We thus vacate the trial court's order of adjudication.

## B. THE TRIAL COURT'S *IN CAMERA* INTERVIEW

The respondents also believe that their due-process rights were violated by the trial court's *in camera* interview of JF. See *In re HRC*, 286 Mich App 444, 455-456; 781 NW2d 105 (2009). They have asked us to vacate the court's order terminating parental rights and remand the case to a different trial judge—the Court of Appeals' remedy in *HRC*, which held that "the use of unrecorded, in camera interviews in termination proceedings violates parents' due process rights." *Id*. at 455.

24

This Court has never addressed the propriety of a trial court conducting an *in camera* interview of the subject child in the context of a child protective proceeding. The *HRC* panel's holding reflected its concern that *in camera* interviews might unduly influence the trial court's factual findings and termination decision, and because the process provides no opportunity for cross-examination by respondents or their counsel, the practice also prejudices a respondent's ability to impeach the witness and forecloses meaningful appellate review. *Id.* at 455-456. The inability to un-ring the bell required a different judge on remand. *Id.* at 457 ("[B]ecause we do not know what information the trial court learned during those interviews, we cannot ascertain whether the trial court would be able to set aside any information obtained in making a new determination . . . .").

The Department does not argue that *HRC* was wrongly decided. It argues that the respondents waived this due-process claim when their counsel supported the trial court's suggestion.

On the second day of the termination hearing, the respondents' attorneys indicated that they had no further witnesses to call. This prompted the following exchange:

> *The Court*: I have a question for counsel. I'm inclined to speak with [JF]. I mean, I've heard a lot of description about it and the counsel who represent her parents may need to talk to the parents. It's not specifically provided for. In the statute where it is in the domestic relations when there is a divorce or custody matter, and I've done dozens, if not hundreds of those, and when I do it I have somebody in there with me, just because I think that's a better policy. Anyone has a right to object, so I'm just contemplating is that all right or is there an opposition to it?
>
> *Ms. Breuker* [counsel for the Department]: In this particular case, I don't necessarily have a problem with it.
>
> *The Court*: All right. I wouldn't do it in most, but—Mr. Leonardson?

*Mr. Leonardson* [counsel for respondent-father]: Your Honor, I would actually request it. I think it's important in this particular case because there is such a strong bond with the family, and that bond, part of it is because of [JF's] needs through her entire life.

*The Court*: Sure. But you don't object to that?

*Mr. Leonardson*: No, I certainly don't.

*The Court*: Mr. Gelow?

*Mr. Gelow* [counsel for respondent-mother]: We don't object. We encourage the Court to talk with [JF].

The court then discussed the logistics of arranging to speak to JF. After reviewing its docket, the court indicated to its clerk that it would speak to JF immediately before one of the respondents' upcoming parenting-time visits[14] and that it might conduct the interview in chambers if there were "a lot of people" in the courtroom. This logistical discussion involved only the court, its clerk, and the Department; the respondents and their lawyers were not included. On the basis of this record, the Court of Appeals agreed with the Department that the respondents had waived any challenge relating to the interview. *Ferranti*, unpub op at 7.

We disagree. Waiver is "the intentional relinquishment or abandonment of a known right," as distinct from a litigant's failure to timely assert that right (forfeiture). *Carines*, 460 Mich at 762 n 7 (quotation marks and citation omitted). Here, the respondents' agreement to the general idea of the court speaking to JF did not waive their right to have

---

[14] Although the respondents and JF enjoyed unsupervised visits without incident throughout the adjudication and dispositional phase, the court modified its initial visitation order in January 2017, shortly after it allowed the Department to file the supplemental petition seeking termination of the respondents' parental rights. By the time of the termination hearing, the respondents' parenting time was limited to Department-supervised visits.

26

that interview comport with due process. The respondents endorsed only the court's initial proposal that the court was "inclined to speak to [JF]." But the court never sought—and the respondents never gave—their agreement about how that conversation would take place.

Those details matter. It is not apparent from the record whether the respondents thought they were agreeing to an on-the-record interview with counsel and with the opportunity for their own examination of JF, or if the respondents knew that the court's process would entail none of that.[15] The record supports only that the respondents were consenting to a conversation between the judge and JF, with the specifics yet to be determined. Because the court could have conducted that interview in a way that would *not* have triggered due-process concerns,[16] we cannot conclude that the respondents' support of the court's general suggestion amounted to the "intentional relinquishment or abandonment of a known right." *Carines*, 460 Mich at 762 n 7 (quotation marks and citation omitted).

We agree with the Court of Appeals that "the use of unrecorded, in camera interviews in termination proceedings violates parents' due process rights." *HRC*, 286 Mich App at 455.

---

[15] While the Department suggests in its briefing that the respondents were aware of the procedure the court intended to use, it cites no record support. And the record seems to contradict this claim. The court discussed its plans only *after* soliciting the respondents' support, and then only in vague terms. And at the final day of the termination hearing, counsel for the respondent-father, while presenting his closing argument, referred to the prospect of the court speaking with JF. The trial court promptly interjected to inform counsel that, much to his surprise, the trial court had already interviewed her.

[16] Most obviously, the court might have examined JF on the record, in the presence of the parties and counsel, and with the opportunity for examination of the witness.

As the *HRC* panel explained, there is "nothing in the juvenile code, the caselaw, the court rules, or otherwise [that] permits a trial court presiding over a termination of parental rights case to conduct in camera interviews of the children for purposes of determining their best interests." *Id*. at 454. And while we sympathize with the court's apparent concern that testifying on the record and in the presence of parties and counsel would have caused discomfort to JF, that interest does not outweigh the respondents' interest in having any testimony on the record, given "the fundamental parental rights involved in termination proceedings, the risk of an erroneous deprivation of those rights given the in camera procedure, and the fact that the information is otherwise easily obtained . . . ." *Id*. at 456; see also *Sanders*, 495 Mich at 410-411 (discussing the three-part balancing test used to determine the constitutional sufficiency of procedures when the state seeks to interfere with a parent's rights). On remand a different judge must preside.[17]

## IV. CONCLUSION

We hold that an appeal of an adjudication error in an appeal from an order terminating parental rights is not a collateral attack. The collateral-bar rule does not apply within one child protective case, barring some issues from review. *Hatcher* was wrongly decided, and we overrule it.

The trial court violated the respondents' due-process rights when it accepted the respondents' pleas without advising them of their rights or ensuring that the respondents'

---

[17] The Department argues that the respondents waived this claim; it makes no argument about what standard should apply if the error wasn't waived. The Court of Appeals in *HRC* reviewed for plain error; the panel's analysis did not depend on the respondent-parent showing outcome-determinative error, presumably because the nature of the trial court's error makes that impossible. See *HRC*, 286 Mich App at 456-457.

28

pleas were knowingly, understandingly, and voluntarily made. *Wangler*, 498 Mich at 911; MCR 3.971. Because it was these legally erroneous pleas that gave the trial court the dispositional authority to terminate the respondents' parental rights, we vacate that order, and the court's order of adjudication, and remand this case to the trial court for further proceedings consistent with this opinion. And the trial court's improper *in camera* interview of JF requires that a different judge preside on remand.

> Bridget M. McCormack
> David F. Viviano
> Richard H. Bernstein
> Elizabeth T. Clement

29

S T A T E  O F  M I C H I G A N

SUPREME COURT

*In re* FERRANTI, Minor.

No. 157907

_____

MARKMAN, J. (*dissenting*).

I respectfully dissent from the majority's reversal of the judgment of the Court of

Appeals.  The majority in the process overrules *In re Hatcher*, 443 Mich 426; 505 NW2d

834 (1993), which held that an adjudication cannot be collaterally attacked following an

order terminating parental rights.  I would not overrule *Hatcher* because I believe that it

was correctly decided and that no sound reason to alter its common-law rule has been

presented.  Indeed, both parties and the amici agree that it makes sense to require a timely

appeal of the adjudication, which is all that *Hatcher* does, and this Court has just recently

adopted court rule amendments that essentially incorporate *Hatcher* into our court rules.[1]

The majority nevertheless chooses in this case to overrule *Hatcher*, which would allow

adjudication challenges to be brought years after the adjudication but for these same

amendments.  Because I believe the Court of Appeals correctly held that: (a) respondents

_____

[1] The Court entered an order amending MCR 3.965, MCR 3.971, MCR 3.972, MCR 3.973,
and MCR 3.993 immediately before the release of this opinion.  Therefore, citations of
court rules in this opinion refer to the court rules as amended on June 12, 2019.  References
to the court rules as they existed before adoption of these amendments will be indicated
using the term "former" preceding the court rule number.  Given that the "former" court
rules were the ones in existence at the time of the adjudication in this case, they are the
ones applicable to this case.

cannot collaterally attack the instant adjudication after their parental rights have been terminated, (b) respondents waived the issue pertaining to the interview of the child, and (c) any error on the trial court's part in visiting respondents' home was harmless, I would affirm the judgment of the Court of Appeals.

## I. BACKGROUND

The child whose future is at issue here, JF, was born in 2003 and has several serious medical issues, including spina bifida, stage three chronic kidney disease, and a neurogenic bladder (a dysfunction caused by neurological damage). As a result of a lack of innervation to the lower half of her body, she has a stoma in her umbilicus to catheterize her bladder and another stoma in the lower quadrant to flush her bowel. She is unable to walk independently and therefore is mobile exclusively by using a wheelchair or walker or by crawling. Respondents-parents live in a small mobile home with JF and three other children, and they have a dog and cats. Their home is cluttered, and the presence of animal fecal matter and urine on the floor is particularly problematic for JF because she is forced to crawl around the home given the small size of the home and the clutter. This exposes her to organisms that lead to frequent urinary tract infections, which, in turn, affects her kidneys and is likely to hasten the time at which she will require a kidney transplant.[2]

According to the 2015 petition to remove JF from her home and place her in foster care under the supervision of petitioner, the Department of Health and Human Services (the Department), as far back as 2013, there was substantiated medical neglect on the part

[2] When JF was removed from respondents' home, she had medical laboratory work performed that revealed that she had a urinary tract infection caused by two organisms that are typically found inside the mouths of cats and dogs.

2

of respondents, including missed medical appointments and the failure to appropriately care for JF's medical needs. Later in 2013, physical neglect due to filthy home conditions was substantiated. All the children were placed in foster care, but the case was terminated in late 2014 following respondents' eventual compliance with the trial court's requirements. In 2015, JF's school contacted Child Protective Services (CPS), reporting that JF often appeared at school with a foul smell of body odor and urine and that she often ran out of catheters. JF was therefore prevented from catheterizing herself on a consistent schedule, which is required to avoid urinary tract infections. A CPS caseworker went to the home, where she saw animal feces on the hallway carpet, dirty dishes on the kitchen counter and filling the sink, and random clutter throughout the home. There were pathways through the clutter to allow the family to move about, but the paths were insufficiently wide to allow navigation by a wheelchair or walker. The condition of the home required JF to crawl in order to get from room to room. The bathroom toilet had fecal matter both inside and outside of the toilet bowl, and the entire home reeked of human and animal urine. There was no way for JF to avoid dragging her legs and feet through dirt and animal feces. Respondents had missed JF's nephrology appointments for the prior three months, and medications for her kidneys had not been refilled for six months. She had not seen her orthopedic specialist for almost a year, even though she was supposed to participate in twice-weekly physical therapy sessions. Recommended six-month visits with a urologist had also been missed.

The petition to remove JF from her home in this case was filed on October 29, 2015. A probable-cause hearing was held on the same day, and the trial court authorized JF's removal. Preliminary hearings were then held on November 3, 2015, and November 17,

2015, and the trial court found probable cause to authorize the petition. On December 21, 2015, respondents admitted to failing to timely fill JF's prescriptions, and the trial court relied on these admissions to exercise jurisdiction. A dispositional hearing was held on January 12, 2016, at which time a treatment plan was adopted and support services were arranged. Review hearings were subsequently held on April 12, 2016, and on July 12, 2016.

At a hearing on October 18, 2016, it was reported that support services were terminated because respondents had not made progress and the condition of their home had not changed. The participating social services worker recommended termination of parental rights because the conditions in the home had not significantly improved. JF's guardian ad litem also recommended terminating respondents' parental rights. The trial judge visited the home himself, although he did not make a record of his findings. He authorized a petition for termination of parental rights, and hearings were held on May 10, 2017, June 20, 2017, and July 5, 2017. The trial judge indicated that he would like to speak with JF. When asked if the parties had any objections, respondent-father's attorney said that he would "actually request it" and respondent-mother's attorney said that he would "encourage the court to talk with [JF]." The trial court spoke with JF off the record and terminated respondents' parental rights on August 7, 2017.

Respondents appealed in the Court of Appeals, contending that the trial court lacked jurisdiction to terminate their parental rights because it had failed to follow court rules at the adjudication stage of the proceedings, i.e., the trial court failed to inform respondents of the rights they would be waiving if their pleas admitting to the jurisdiction of the court were accepted, MCR 3.971(B)(3), and failed to inform them of the consequences of their

4

plea, MCR 3.971(B)(4). They also argued that the trial court erred by personally visiting their home and interviewing the child.

The Court of Appeals affirmed the termination. *In re Ferranti*, unpublished per curiam opinion of the Court of Appeals, issued May 10, 2018 (Docket Nos. 340117 and 340118). It held that, even assuming that the trial court failed to follow the proper procedures under former MCR 3.971(B)[3] when taking respondents' pleas, respondents failed to timely appeal and could not collaterally attack the adjudication after the trial court had terminated their parental rights. *Id*. at 6. The Court of Appeals also held that although the trial court erred by personally visiting and viewing respondents' home, reversal was not warranted because respondents did not demonstrate that the error in any way affected their substantial rights. *Id*. at 8-9. Finally, it held that respondents waived their challenge to the court's *in camera* interview of JF. *Id*. at 9. This Court subsequently ordered and heard oral argument on whether to grant respondents' application for leave to appeal. *In re Ferranti*, 502 Mich 906 (2018).

## II. STANDARDS OF REVIEW

The collateral-attack rule is a common-law rule. Note, *Collateral Bar and Contempt: Challenging a Court Order After Disobeying It*, 88 Cornell L Rev 215, 219 n 15 (2002). The interpretation and applicability of a common-law rule is a question of law that is reviewed de novo. *Haksluoto v Mt Clemens Regional Med Ctr*, 500 Mich 304, 310; 901 NW2d 577 (2017). "[W]hen it comes to alteration of the common law, the traditional rule

---

[3] See MCR 3.971(B), as amended March 28, 2018, 501 Mich ___ (2018), effective May 1, 2018.

5

must prevail absent compelling reasons for change." *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 260; 828 NW2d 660 (2013). In addition, whether due-process concerns may override the collateral-attack rule poses a question of constitutional law that is reviewed de novo. *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 333; 901 NW2d 566 (2017). Finally, the interpretation of statutes and court rules is also a question of law that is reviewed de novo. *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017).

### III. ANALYSIS

### A. *HATCHER*

The trial court clearly erred in failing to abide by MCR 3.971(B)(3) and (4) at the adjudication proceeding, i.e., it failed to apprise respondents of their rights that they would be waiving if their pleas admitting to the jurisdiction of the court were accepted and failed to apprise them of the consequences of their pleas.[4] However, respondents did not appeal

---

[4] MCR 3.971 provides, in pertinent part:

> (B) Advice of Rights and Possible Disposition. Before accepting a plea of admission or plea of no contest, the court must advise the respondent on the record or in a writing that is made a part of the file:
>
> * * *
>
> (3) that, if the court accepts the plea, the respondent will give up the rights to
>
> (a) trial by a judge or trial by a jury,
>
> (b) have the petitioner prove the allegations in the petition by a preponderance of the evidence,
>
> (c) have witnesses against the respondent appear and testify under oath at the trial,

6

the adjudication until after the trial court had terminated their parental rights, nearly two years after the adjudication. This Court has held that such collateral attacks are impermissible. *Hatcher*, 443 Mich at 437. That is, *Hatcher* held that a parent cannot wait to challenge the adjudication until after the parent's parental rights have been terminated. As we recognized, "If such a delayed attack were always possible, decisions of the probate court would forever remain open to attack, and no finality would be possible." *Id*. at 440 (quotation marks and citation omitted). Accordingly, *Hatcher* held:

> Our ruling today severs a party's ability to challenge a probate court decision years later in a collateral attack where a direct appeal was available. It should provide repose to adoptive parents and others who rely upon the finality of probate court decisions. [*Id*. at 444.]

As this Court recently explained in *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014):

> In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase. Generally, a court determines whether it can take jurisdiction over the child in the first place during the adjudicative phase. Once the court has jurisdiction, it determines during the dispositional phase what course of action will ensure the child's safety and well-being. [Citations omitted.]

Child protective proceedings begin with the filing of a petition. MCR 3.961. The trial court must decide at that juncture whether to authorize the petition, which is done "upon a

---

> (d) cross-examine witnesses, and
>
> (e) have the court subpoena any witnesses the respondent believes could give testimony in the respondent's favor;
>
> (4) of the consequences of the plea, including that the plea can later be used as evidence in a proceeding to terminate parental rights if the respondent is a parent.

7

showing of probable cause, unless waived, that one or more of the allegations in the petition are true and fall within MCL 712A.2(b)." MCR 3.965(B)(12). If the court authorizes the petition, the case then proceeds to the adjudicative phase, in which the court must determine, by plea or trial, whether one or more of the statutory grounds alleged in the petition have been proved by a preponderance of the evidence. MCR 3.971; MCR 3.972(E). Once the trial court determines that one or more of the statutory grounds alleged in the petition have been proved by a preponderance of the evidence, the respondent has been adjudicated and the court proceeds to the dispositional phase.

The dispositional phase consists of review hearings and orders imposing courses of action that will ensure the child's safety and well-being. "A dispositional hearing is conducted to determine what measures the court will take with respect to a child properly within its jurisdiction and, when applicable, against any adult, once the court has determined following trial, plea of admission, or plea of no contest that one or more of the statutory grounds alleged in the petition are true." MCR 3.973(A). "[A]n order of disposition placing a minor under the supervision of the court or removing the minor from the home" is "appealable to the Court of Appeals by right[.]" Former MCR 3.993(A)(1).[5] "[T]he dispositional phase ends with a permanency planning hearing, which results in either the dismissal of the original petition and family reunification or the court's ordering [the Department] to file a petition for the termination of parental rights." *Sanders*, 495 Mich at 407.

---

[5] See MCR 3.993(A)(1), as adopted February 4, 2003, 467 Mich cccxxxiii (2003), effective May 1, 2003.

8

As this Court has explained, "[T]he probate court's subject matter jurisdiction is established when the action is of a class that the court is authorized to adjudicate, and the claim stated in the complaint is not clearly frivolous." *Hatcher*, 443 Mich at 437. That is, formal jurisdiction is "established by pleadings, such as the petition," not by the evidence. *Id*. at 438; see also *id*. at 443 ("That the evidence failed to support the petition did not affect the jurisdiction of the court, in the proper sense of the term, to hear the cause and to make the order.") (quotation marks and citation omitted).

What the court does in response to the petition represents the exercise of the court's jurisdiction. If the trial court errs while exercising its jurisdiction, this does not affect the court's subject matter jurisdiction itself. *Id*. at 437 ("Procedural errors that may have occurred did not affect the probate court's subject matter jurisdiction."). As we explained in *Hatcher*, 443 Mich at 438-439:

> Want of jurisdiction must be distinguished from error in the exercise of jurisdiction. Where jurisdiction has once attached, mere errors or irregularities in the proceedings, however grave, although they may render the judgment erroneous and subject to be set aside in a proper proceeding for that purpose, will not render the judgment void, and until set aside it is valid and binding for all purposes and cannot be collaterally attacked. Error in the determination of questions of law or fact upon which the court's jurisdiction in the particular case depends, the court having general jurisdiction of the cause and the person, is error in the exercise of jurisdiction. Jurisdiction to make a determination is not dependent upon the correctness of the determination made. [Quotation marks and citations omitted.]

While "lack of subject matter jurisdiction can be collaterally attacked[,] . . . the exercise of that jurisdiction can be challenged only on direct appeal." *Id*. at 439. To be precise, the exercise of jurisdiction "cannot . . . be challenged years later in a collateral attack." *Id*. at 439-440 (quotation marks and citation omitted); see also *In re Gazella*, 264 Mich App 668,

679-680; 692 NW2d 708 (2005) ("Matters affecting the court's exercise of its jurisdiction may be challenged only on direct appeal of the jurisdictional decision, not by collateral attack in a subsequent appeal of an order terminating parental rights.");[6] *In re SLH*, 277 Mich App 662, 668; 747 NW2d 547 (2008) ("Ordinarily, an adjudication cannot be collaterally attacked following an order terminating parental rights.").

In *SLH*, 277 Mich App at 668-669, 669 n 13, the Court of Appeals explained that an adjudication challenge following an order terminating parental rights is not a collateral attack when termination occurred at the initial disposition:

> Ordinarily, an adjudication cannot be collaterally attacked following an order terminating parental rights. That is true, however, only when a termination occurs following the filing of a supplemental petition for termination after the issuance of the initial dispositional order. If termination occurs at the initial disposition as a result of a request for termination contained in the original, or amended, petition for jurisdiction, then an attack on the adjudication is direct and not collateral, as long as the appeal is from an initial order of disposition containing both a finding that an adjudication was held and a finding that the children came within the jurisdiction of the court.[13]

---

[13] . . . [B]ecause an initial order of disposition is the first order appealable as of right, an appeal of the adjudication following the issuance of an initial dispositional order is not a collateral attack on the initial adjudication, but a direct appeal, notwithstanding that a termination of parental rights may have occurred at the initial dispositional hearing.

---

[6] In *Gazella*, 264 Mich App at 680, the Court of Appeals asserted:

> As noted earlier, the original order of disposition entered June 2, 2003, and filed June 5, 2003, stated that an adjudication was held, that the children were found to come within the jurisdiction of the court, and that they were placed in out-of-home care. That is the order that was appealable as of right to challenge the adjudication. By not appealing that order, respondent lost her right to challenge the court's exercise of jurisdiction.

10

Essentially, what *SLH* explained is that if a respondent-parent appeals the adjudication at the first opportunity that he or she can, this does not constitute a collateral attack.

In *SLH*, the trial court had orally determined that the children came within its jurisdiction and then set the matter for a dispositional hearing without first entering an adjudication order. Following the dispositional hearing, the trial court entered an order of disposition and an order terminating parental rights on the same day, and both orders stated that an adjudication was held and that the children were found to fall within the jurisdiction of the court. The respondent-parent appealed, arguing that the trial court erred by taking jurisdiction over the children. The Court of Appeals held that this did not constitute a collateral attack because the contemporaneous order of disposition and order terminating parental rights "contain the first appealable finding of adjudication that the children came within the jurisdiction of the court." *Id.* at 668.

In summation, an adjudication cannot be collaterally attacked following an order terminating parental rights unless the termination occurred at the initial disposition. In the instant case, however, the adjudication and the termination were separated by a lengthy period of attempts at reunification. Therefore, respondents are barred from collaterally attacking the adjudication.

At an adjudication hearing on December 21, 2015, respondents admitted to some of the allegations in the petition, and on January 12, 2016, the court entered a dispositional order. Additional dispositional hearings occurred, additional dispositional orders were entered, and services were provided to respondents. On August 7, 2017, the trial court granted the petition to terminate respondents' parental rights. On September 8, 2017, respondents appealed in the Court of Appeals, arguing, among other things, that the trial

11

court erred during the adjudication hearing by failing to advise respondents of their rights as required by MCR 3.971.

Although the trial court certainly breached MCR 3.971 by not advising respondents of their rights, respondents failed to timely raise this issue.[7] Respondents should have raised this issue after the adjudication and the first dispositional order entered on January 12, 2016. See former MCR 3.993(A)(1) ("[A]n order of disposition placing a minor under the supervision of the court or removing the minor from the home" is "appealable to the Court of Appeals by right[.]").[8] But, instead, respondents waited nearly two years to raise

---

[7] Although the Department acknowledges that the trial court did not comply with MCR 3.971, contrary to the majority's contention, the Department has not conceded that this violated respondents' due-process rights.

[8] The majority takes issue with *Hatcher*'s statement that "[t]he respondent could have appealed the court's exercise of its statutory jurisdiction by challenging the sufficiency of the petition," *Hatcher*, 443 Mich at 438, because, according to the majority, "[t]he error in the adjudication occurred *after* the preliminary hearing, when the probable-cause determination was made [and] the father could not have appealed an error that had yet to occur." However, given that *Hatcher* cited MCR 5.993, which was the predecessor of our current MCR 3.993, immediately after the statement with which the majority takes issue, it is more than reasonably clear that *Hatcher* was stating, in fact, that the respondent could have filed an appeal of right *after* the adjudication, i.e., after the court entered an "order of disposition placing a minor under the supervision of the court," former MCR 3.993(A)(1). The "sufficiency of the petition" remained at issue at that point because the probate court presumably had relied on the allegations in the petition as well as the parents' stipulation that the child should become a temporary ward at the adjudication hearing. For these reasons, I do not believe *Hatcher* was nonsensically suggesting that the father should have appealed an error that had yet to occur.

In addition, and again contrary to the majority's contention, I do not believe that *Hatcher* suggested that "the father could have raised the adjudication error . . . in a motion for rehearing from the order terminating parental rights," which, as the majority itself recognizes, would have been inconsistent with *Hatcher*'s ultimate conclusion. Rather, *Hatcher* simply noted that "[a] parent is . . . entitled to request a rehearing not later than twenty days after an order terminating parental rights and removing the child from parental

12

this issue.[9] *They waited until after several dispositional hearings had been held, after several dispositional orders had been entered, after several months of services had been provided, after JF had been living in foster care for almost two years, and after their parental rights had been terminated nearly two years after adjudication.*

*Hatcher* bars respondents' collateral attack, as it should. Unlike the majority, I would not overrule *Hatcher* because if there is any realm of law in which finality is critical, it is with regard to child protective proceedings. The Department spent several years attempting (tragically without success) to reunite respondents with their child. Parents who have been given several years to rehabilitate themselves and who have continually failed to do so should not be permitted to reinitiate the entire process by challenging aspects of the adjudication that occurred at its very outset. It is simply not fair to children to require them to endure this process again. It is also not fair to prospective adoptive parents. Given that the dispositional phase of a child protective proceeding may proceed for several

custody" and that this statutory safeguard ensures the parent time to "challenge a court's exercise of its jurisdiction." *Hatcher*, 443 Mich at 436. Terminating parental rights constitutes an exercise of the court's jurisdiction and, as recognized by *Hatcher*, such an exercise can be challenged by requesting a rehearing not later than 20 days after an order terminating parental rights has been entered. Entering an order of adjudication also constitutes an exercise of jurisdiction and, as also recognized by *Hatcher*, such an exercise can be challenged by filing an appeal of right after the trial court enters its initial dispositional order; it, however, cannot be challenged "years later in a collateral attack where a direct appeal was available." *Id*. at 444.

[9] Although our court rules at that time did not require the trial court to inform-- much less repeatedly inform-- respondents that they possessed an appeal of right from the initial dispositional order, these rules did clearly provide for such an appeal of right, see former MCR 3.993(A)(1), they did not provide for the additional and much-delayed appeal of right sought in this case, and respondents were represented by counsel who was certainly aware of all this.

13

months, or even several years, it is important to ensure, as *Hatcher* does, that errors made during the adjudicative phase cannot result in all that was accomplished during the ensuing dispositional phase to be undone. Not only would this result in wasted time, money, resources, and public and private effort, but most importantly it would risk disrupting whatever progress and rehabilitation the children might have made during that time.

Such a "do-over" would require the entire process to begin all over-- there would have to be another adjudication hearing, another service plan would have to be created, more dispositional hearings would have to be held, respondents would have to be given further opportunities to comply with the service plan, and ultimately, more likely than not, there would have to be another termination hearing. Yet, the end result would almost inevitably be the same-- respondents' parental rights would be terminated. The only difference would be that the process would have taken twice as long. Instead of the children having to go through this process, perhaps bouncing around from foster-care home to foster-care home for two to three years, they would then have to endure this process for four to six years. That, in my judgment, would be untenable and unacceptable.

The majority holds that *Hatcher* was wrongly decided because all of the cases on which it relied were, in the majority's view, finely distinguishable in the sense that they were all civil cases in which a second action was started to undo a prior final order,[10]

---

[10] For example, in *Jackson City Bank & Trust Co v Fredrick*, 271 Mich 538; 260 NW 908 (1935), this Court held that a divorce judgment could not be collaterally attacked in a subsequent action to set aside a conveyance of real estate. In addition, in *Life Ins Co of Detroit v Burton*, 306 Mich 81; 10 NW2d 315 (1943), this Court held that an order reforming a surety bond could not be collaterally attacked in a subsequent action to set aside a sheriff's sale. Finally, in *Edwards v Meinberg*, 334 Mich 355; 54 NW2d 684 (1952), this Court held that a judgment in an action in assumpsit on a promissory note could

whereas *Hatcher* and the present case are child protection cases in which the parents are simply challenging a nonfinal order (the adjudication) after the first final order (the termination order) has been entered. The majority is correct that generally a party appealing a final order in a case can raise issues relating to prior nonfinal orders in that same case. See *Green v Ziegelman*, 282 Mich App 292, 301 n 6; 767 NW2d 660 (2009) ("[A] party claiming an appeal of right from a final order is free to raise issues on appeal related to prior orders.") (quotation marks and citation omitted). The majority is also correct that an adjudication/initial dispositional order is not a final order and that the first final order is the order terminating parental rights. See MCR 7.202(6)(a)(i) (defining "final order" as "the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties"). Nonetheless, the majority is seriously *incorrect* in failing to recognize that although there is only one final order in a child protection case, there are at least two orders that are appealable by right, i.e., the initial dispositional order and the order terminating parental rights. Presumably, the initial dispositional order is appealable by right at least in significant respect so that errors that have occurred during the adjudication can be remedied in a timely fashion. This, once again, is the appropriate time at which the parents should raise challenges they have regarding the adjudication.

A "collateral attack" is defined as "[a]n attack on a judgment in any manner other than by action or proceeding, whose very purpose is to impeach or overturn the judgment; or, stated affirmatively, a collateral attack on a judgment is an attack made by or in an

---

not be collaterally attacked in a subsequent action for damages for abuse of process in obtaining a writ of garnishment against the plaintiff's wages to satisfy the original judgment.

15

action or proceeding that has an independent purpose other than impeaching or overturning the judgment." *Black's Law Dictionary* (6th ed). Former MCR 3.993(A)(1) provided that "an order of disposition placing a minor under the supervision of the court" was appealable by right. This appeal by right of the order of disposition placing a minor under the supervision of the court is the proceeding whose "very purpose" is to overturn the decision to place a minor under the supervision of the court, i.e., the adjudication. In other words, *this* moment is the time to directly attack the adjudication. An order terminating parental rights is also appealable by right. Former MCR 3.993(A)(2).[11] However, this appeal by right has an "independent purpose" other than overturning the adjudication, which is to overturn the trial court's actual decision to terminate parental rights. In other words, the "very purpose" of this appeal is to attack the termination, not the adjudication. Therefore, attacking the adjudication in the appeal of the termination order clearly constitutes a "collateral"-- rather than a direct-- attack.[12]

The majority rationalizes its conclusion on the grounds that this Court has putatively adopted numerous "exceptions" to *Hatcher*'s collateral-attack rule and, as a result, this Court should now simply overrule the decision. Once again, I disagree. Indeed, I do not

---

[11] The new court rules renumber this provision as MCR 3.993(A)(4), but the language is unchanged.

[12] Moreover, regardless of whether a posttermination challenge to the adjudication is labeled a collateral attack or a direct attack, the critical point is that *Hatcher* simply requires a *timely* appeal of the adjudication, which both parties and the amici agree benefits all involved, including parents, children, and prospective adoptive parents, as well as the public interests served by this process. Thus, even if one takes issue with characterizing a posttermination challenge as a "collateral" challenge, as the majority does, that still does not mean that we should abolish the *Hatcher* rule, which again simply requires a timely appeal of the adjudication.

16

believe that any of the cases cited by the majority actually adopted any "exception" to the *Hatcher* rule. In *Sanders*, 495 Mich at 401, for example, *Hatcher* did not apply because there had never been any adjudication of the respondent-father; the trial court had simply applied the "one-parent" doctrine-- that is, the court entered dispositional orders affecting the rights of both parents based on an adjudication solely of the mother. Given that the respondent-father obviously could not have appealed that adjudication because he was not a party, his challenge of that adjudication in his appeal after the termination of *his* parental rights was not a collateral attack. See *In re Kanjia*, 308 Mich App 660, 670; 866 NW2d 862 (2014) ("Because respondent was never adjudicated, and in fact was not named as a respondent in the trial court's order of adjudication, it is difficult to see how he could have appealed that order of adjudication."). Because *Sanders* did not involve a collateral attack, *Sanders* could not have given rise to an "exception" to *Hatcher*'s collateral-attack rule. And, unlike the respondent in *Sanders* (as well as in *Kanjia*), respondents here were fully adjudicated by the trial court; nothing precluded them from directly attacking the resultant adjudication order.[13]

---

[13] Similarly, *In re Wangler*, 498 Mich 911, 911 (2015), also could not have created an "exception" to *Hatcher*; it simply held that because "the court purported to issue dispositional orders without first adjudicating the respondent-mother, the respondent-mother's appeal should not be regarded as an impermissible collateral attack on jurisdiction." In other words, *Wangler* held that because the respondent had never been formally adjudicated, given that her adjudication had been held in abeyance, her challenge of the adjudication proceeding following the termination of her parental rights was not a collateral challenge. Again, unlike the respondent in *Wangler*, respondents in the instant case were formally adjudicated; thus, their challenge of the adjudication following the termination of their parental rights was a collateral challenge.

In addition, in *In re Hudson*, 483 Mich 928 (2009), and *In re Mitchell*, 485 Mich 922 (2009), this Court simply pointed out errors that were made during the adjudications; these errors were not dispositive though because the trial court had also made errors during the disposition stage, e.g., "the trial court committed clear error in finding that the Department of Human Services presented clear and convincing evidence in support of the statutory grounds for terminating the respondent-mother's parental rights." *Hudson*, 483 Mich at 928. Therefore, I would hardly characterize these cases as having created "exceptions" to *Hatcher*.[14] Accordingly, contrary to the majority's assertion, this Court has not already carved out numerous "exceptions" to the *Hatcher* rule, and for the reasons articulated throughout this dissent, I would not begin to do so today.

As noted earlier, the collateral-attack rule is a common-law rule, and "when it comes to alteration of the common law, the traditional rule must prevail absent compelling reasons for change." *Price*, 493 Mich at 260. Respondents' predominant concern regarding *Hatcher*'s collateral-attack rule is that it is unfair because trial courts are not advising parents of their appellate rights following adjudication and that despite not knowing their

---

[14] *In re Mays*, 490 Mich 993, 994 (2012), also did not create an "exception" to *Hatcher* because it merely held that "the trial court clearly erred in concluding that a statutory basis existed for termination of respondent's parental rights." Indeed, *Mays* expressly stated that it was not addressing the validity of the adjudication because that issue had not been timely raised and expressly cited *Hatcher* in support of that position. *Id*. at 994 n 1. Similarly, *In re Mason*, 486 Mich 142; 782 NW2d 747 (2010), cannot be characterized as creating an "exception" to *Hatcher* because it merely held that the Department did not sufficiently involve the respondent in the reunification process; it did not even address the adjudication process. Finally, *In re Jones*, 499 Mich 862 (2016), also cannot be characterized as creating an "exception" to *Hatcher* because all this Court did there was to enter an order consistent with the parties' joint motions requesting that we vacate the trial court's order terminating the respondent's parental rights.

18

appellate rights, the collateral-attack rule punishes respondents for not appealing. However, this Court just recently (and correctly, in my judgment) amended the court rules to address that problem. Specifically, we just amended the court rules to require the trial court to advise parents that they have an appeal of right from the initial dispositional order and that if they do not challenge the adjudication at that point, they will not be able to challenge it after their parental rights have been terminated, with two exceptions.[15] At oral argument, respondents' counsel supported this idea: "I wholeheartedly agree with the court rule and the world you want, which is early decisions, appeal them right away, and it benefits everybody." The Department and the Attorney General also indicated support for this idea. Given our recent court rule amendments, the majority has set forth no reason, let alone a "compelling reason," to justify its present alteration of the common-law rule.

The majority asserts that overruling *Hatcher* will not cause " 'practical, real-world dislocations.' " However, this is only true because of this Court's recent court rule amendments. In other words, if this Court had not amended the court rules to essentially incorporate *Hatcher* into the court rules, the majority's overruling of *Hatcher* would have caused " 'practical, real-world dislocations,' " because, as discussed earlier, it would have allowed parents to bring untimely challenges regarding the adjudication that, if successful, would have required the process to begin all over again no matter how much time had already elapsed attempting (unsuccessfully) to reunite the parents with their children.

---

[15] Parents will still be able to challenge the adjudication in an appeal from the order terminating their parental rights if their rights were terminated at the initial dispositional hearing, which, as discussed earlier, is already allowed under *SLH*, 277 Mich App at 668-669, and also if the court failed to inform them of their right to appeal, MCR 3.971(C); MCR 3.972(G); MCR 3.973(H). I also support these exceptions.

19

I am not sure why the majority feels compelled to overrule *Hatcher* given that the Court has now essentially incorporated it into our court rules. The majority says the following about *Hatcher*:

> *Hatcher* disrupts the careful balancing of interests in our juvenile code by preventing judicial review of meritorious claims of defects in the adjudication. That is, it prevents review of mistakes in the government process that permanently separates a parent from a child. A parent's only remedy under *Hatcher* is by way of an interlocutory appeal, disincentivizing him or her from timely cooperating with the Department and further delaying a final determination. *Hatcher* disserves parents, their children, and the state. It's time to disavow it.

Yet we have just incorporated *Hatcher* into our court rules by adopting a new rule that requires that parents timely raise challenges regarding the adjudication in their appeal of right from the initial dispositional order. MCR 3.971(B)(8); MCR 3.972(F)(3); MCR 3.973(G)(4). I am not sure why the majority has these concerns regarding *Hatcher* but not regarding the amended court rules. Regardless, I believe that the majority's concerns regarding *Hatcher* are unfounded.

To begin with, *Hatcher* does not "prevent[] judicial review of meritorious claims"; rather, it merely requires that such claims be pursued in a timely manner, which is consistent with the interests of all affected parties, including the children themselves. In other words, there is an appropriate time to challenge the adjudication and an inappropriate time, and waiting until years after the adjudication, and until after parental rights have been terminated, fits squarely within the latter category.

Next, the majority contends that "[a] parent's only remedy under *Hatcher* is by way of an interlocutory appeal, disincentivizing him or her from timely cooperating with the Department and further delaying a final determination." But nothing about *Hatcher*

prevents a parent from both challenging an adjudication and at the same time abiding by the court's orders. There will be no disincentive, just as there is no particular or obvious disincentive in the many cases in which an interlocutory appeal is filed. Furthermore, it is certainly better to delay a final determination than it is to wait until after that determination has been made and then require a complete "do-over." Indeed, both parties at oral argument agreed that immediately appealing the adjudication benefits everyone. As respondents' counsel explained: "[W]e don't want adjudication appeals-- it's not good for the parents I represent to have an adjudicatory error two years later. And then, we have to go back in time." And as the Department further explained, witnesses may be difficult to find, unavailable, or simply may not remember as well given the passage of time. For all these reasons, I would not overrule *Hatcher*.

## B. DUE PROCESS

This Court asked the parties to address "if *Hatcher* was correctly decided, whether due process concerns may override the collateral bar rule . . . ." *In re Ferranti*, 502 Mich at 906. I would answer this inquiry in the negative. *Hatcher* expressly overruled *Fritts v Krugh*, 354 Mich 97; 92 NW2d 604 (1958), which "attempted to correct what it perceived to be a gross lack of procedural due process" by "permitt[ing] [a] collateral attack on the exercise of jurisdiction." *Hatcher*, 443 Mich at 440. By overruling *Fritts*, despite recognizing that it involved a due-process challenge, *Hatcher* made it altogether clear that it intended the collateral-attack rule to apply to due-process challenges.

Almost any violation of court rules can be couched in terms of a constitutional due-process violation.[16] For example, in this case, the majority holds that the trial court's failure to inform respondents of (a) the rights they would be waiving if their plea admitting to the jurisdiction of the court was accepted, as is required by MCR 3.971(B)(3); and (b) the consequences of their plea, as is required by MCR 3.971(B)(4), violated due process. See also, e.g., *Hudson*, 483 Mich at 929 (CORRIGAN, J., concurring) (concluding that the trial court's failure to advise the respondent of the consequences of her plea of admission, contrary to MCR 3.971(B), and failure to appoint counsel at the respondent's first appearance, contrary to MCL 712A.17c, violated the respondent's due-process rights). Accordingly, if this Court were to adopt a due-process exception to the rule of *Hatcher*, that exception would effectively swallow the entire rule. In other words, adopting a due-process exception would be tantamount to overruling *Hatcher*.

Furthermore, not allowing parents to challenge the adjudication after parental rights have been terminated can hardly be said to violate their due-process rights because they have enjoyed a full opportunity to challenge the adjudication, from which determination

---

[16] See *In re Sanders*, 495 Mich at 458 (MARKMAN, J., dissenting):

> Concerning due process, it is always possible to extend additional procedural rights and entitlements to persons who come into contact with the government, as criminal defendants, public employees, consumers of public services, regulated parties, recipients of social-services benefits, or parents of abused and neglected children. Additional hearings and additional appeals can always be convened, more protective rules of evidence can always be prescribed, and broader compliance with ever finer details of process can always be required. There is simply no end to the argument that "fairness" requires something more, and there is little specificity in the Due Process Clause that either sustains or refutes most such arguments.

they possess an appeal of right. That they do not also enjoy the right to challenge the adjudication *after* termination is simply a function of the fact that the state also possesses an undeniable interest in seeking relief for the abused and neglected child in a timely and reasonable manner.[17]

### C.  PRESERVATION AND PLAIN ERROR

This Court also asked the parties to address "what must a respondent do to preserve for appeal any alleged errors in the adjudication" and "by what standard should courts review the respondents' challenge to the initial adjudication . . . ." *In re Ferranti*, 502 Mich at 906.  I agree with the majority that "a party's failure to timely assert a right in the trial court generally means that any resulting error will be treated as 'unpreserved' if challenged on appeal," and it is undisputed that respondents did not challenge the adjudication at the trial court level.  To preserve for appeal an alleged error in the adjudication, the respondent would have had to have raised the error at the adjudication hearing.  *People v Pipes*, 475

---

[17] See *Mathews v Eldridge*, 424 US 319, 333, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976), which provides that the following factors should generally be considered when determining "what process is due":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

While respondents' "private interest" in their parenthood is undeniably of the highest order, there is no obvious "risk of an erroneous deprivation" of this interest by the requirement that an appeal taken to rectify errors occurring during the adjudication be undertaken in a timely manner.  Furthermore, the "Government's interest" in the circumstances of the abused and neglected child is also of the highest order.

23

Mich 267, 277; 715 NW2d 290 (2006) ("In order to properly preserve an issue for appeal, a defendant must raise objections at a time when the trial court has an opportunity to correct the error . . . .") (quotation marks and citation omitted). As this Court explained:

> Any other conclusion would be contrary to the rule that defendants cannot "harbor error as an appellate parachute." "The rule that issues for appeal must be preserved in the record by notation of objection is a sound one," and that rule is totally eviscerated in situations, such as this, where defendants never address appealable issues with the trial court. [*Id*. at 278 n 39 (citations omitted).]

If the respondent does not properly preserve the issue, this Court should review the respondent's challenge to the initial adjudication for plain error. See *Hudson*, 483 Mich at 928 ("The trial court also committed plain error, *People v Carines*, 460 Mich 750, 763 (1999), in failing to . . . timely appoint counsel in violation of MCL 712A.17c(4) and (5), MCR 3.915(B)(1), MCR 3.965(B)(5), and MCR 3.974(B)(3)(a)(i), and in failing to advise the respondent that her plea could later be used in a proceeding to terminate parental rights in violation of MCR 3.917(B)(4)."); *Mitchell*, 485 Mich at 922 ("[T]he trial court committed plain error, *People v Carines*, 460 Mich 750, 763 (1999), in failing to timely appoint counsel in violation of MCL 712A.17c(4) and (5), MCR 3.915(B)(1), MCR 3.965(B)(5), and MCR 3.974(B)(3)(a)(i), and in failing to advise the respondent that his plea could later be used in a proceeding to terminate his parental rights in violation of MCR 3.971(B)(4).").

In *Carines*, 460 Mich at 763, this Court held:

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. "It is the defendant rather than the

24

> Government who bears the burden of persuasion with respect to prejudice."
> Finally, once a defendant satisfies these three requirements, an appellate
> court must exercise its discretion in deciding whether to reverse. Reversal is
> warranted only when the plain, forfeited error resulted in the conviction of
> an actually innocent defendant or when an error " 'seriously affect[ed] the
> fairness, integrity or public reputation of judicial proceedings' independent
> of the defendant's innocence." [Citations omitted; alteration in original.]

In this context, it would be difficult for a respondent to prove that an error affected the outcome of the lower court proceedings. For example, in the instant case, the errors were that the trial court failed to inform respondents of (a) the rights that they would be waiving if their plea admitting to the jurisdiction of the court was accepted, as is required by MCR 3.971(B)(3); and (b) the consequences of their plea, as is required by MCR 3.971(B)(4). Although these were certainly errors and were plain errors, I do not understand how these errors conceivably affected the outcome of the proceedings. Respondents have nowhere alleged that they would not have pleaded to the allegations in the petition if the trial court had properly advised them of the rights that they were waiving and/or of the consequences of their plea.[18] And even if they had so alleged, I do not understand how the outcome of the proceedings would have been altered because, at most, an adjudication trial would have been conducted and the trial court likely would have found again that one or more of the statutory grounds alleged in the petition had been proved by a preponderance of the evidence, i.e., that respondents were unfit.[19] There is simply no serious question that even

---

[18] Furthermore, respondents were actually advised of many of their rights at the preliminary hearing on October 29, 2015, and were both represented by counsel at every phase of the proceedings.

[19] The majority asserts that "[t]his misses the point" because "the constitutional deficiencies here are not forgiven by what might have transpired at trial." Respectfully, I believe it is the majority that errs because it is well established that parties are not entitled

absent respondents' plea, the trial court would have adjudicated respondents, the dispositional phase would have proceeded in the same way, and respondents' parental rights would have been terminated. Indeed, respondents do not even dispute the sufficiency of the evidence in support of the adjudication or of the termination of their parental rights. Therefore, in my view, although the majority overrules *Hatcher*, respondents are still not entitled to relief.

### D. HOME VISIT

This case also involves two non-*Hatcher* issues. The first such issue we asked the parties to address is "whether a trial court is permitted to visit a respondent's home to observe its condition, and, if so, what parameters should apply to doing so[.]" *In re Ferranti*, 502 Mich at 906. The parties agree that a trial court is not permitted to visit a respondent's home to observe its condition. MCR 2.507(D), the rule allowing under certain circumstances the court's view of "property or a place where a material event occurred," is not among the rules applicable to child protective proceedings. MCR 3.923(A), which *does* apply, provides:

> If at any time the court believes that the evidence has not been fully developed, it may:
>
> (1) examine a witness,
>
> (2) call a witness, or

---

to relief for unpreserved constitutional errors unless they can establish that "the error affected the outcome of the lower court proceedings," *Carines*, 460 Mich at 763, and the latter determination is necessarily made by comparing the flawed proceeding with a hypothetical unflawed proceeding, i.e., by inquiring as to "what might have transpired at trial."

(3) adjourn the matter before the court, and

(a) cause service of process on additional witnesses, or

(b) order production of other evidence.

Note that the court rule does not allow the court to view a home. For these reasons, I agree with the parties and the Court of Appeals that the trial court erred by visiting respondent's home.

However, I further agree with the Court of Appeals that this error was harmless. Respondents did not object to the error, and therefore the plain-error test applies. See *Carines*, 460 Mich at 763-764. Even assuming that there was error and that the error was plain, respondents are not entitled to relief because they were not prejudiced as a result of the error. As the Court of Appeals explained:

> [G]iven the trial court's reliance on the testimony of witnesses who described both the historical condition of the home, the services provided, and the current condition of the home, as well as the effect of the condition of the home on JF's medical condition, it does not appear that the trial court's visit to the home affected the outcome of the proceedings. The court found that "the many professionals unanimously agreed that the house was unhygienic and was probably not going to improve" even though the condition of the home was "not as atrociously bad as it was." The trial court's lone reference to the court's viewing of the home was that
>
> > it is not where a person with [spina bifida] will thrive. [JF] chooses to crawl for locomotion when she is in the home and the home will never be clean enough for her to avoid infections.
>
> This finding is amply supported by the testimony of the witnesses with respect to the condition of the home and its effect on JF's medical condition, and the trial court's statement regarding its view of the home reflects that the court's viewing of the home confirmed the witnesses' testimony. Under these circumstances, respondents have failed to demonstrate that the trial

27

court's error in visiting the home affected their substantial rights. [*Ferranti*, unpub op at 8-9.]

I agree with the Court of Appeals.

### E.  INTERVIEW OF THE CHILD

The other non-*Hatcher* issue we asked the parties to address concerns "whether a trial court may interview a child who is the subject of child protective proceedings in chambers, and, if so, what parameters should apply to doing so." *In re Ferranti*, 502 Mich at 906.  Again, the parties agree that a trial court may not interview in chambers a child who is the subject of child protective proceedings.  See *In re HRC*, 286 Mich App 444; 781 NW2d 105 (2009).  While the court rules permit the use of *in camera* interviews for the limited purpose of determining a child's parental preference in child custody cases, see MCR 3.210(C)(5), they do not permit the use of *in camera* interviews in child protective cases.[20]  Accordingly, the trial court erred by conducting an *in camera* interview of the child.

However, I agree with the Court of Appeals that respondents waived this issue.  At one point, respondent-father's counsel asked respondent-father, "Are you asking the Court to interview [JF] prior to making a decision on termination?" and respondent-father answered, "I would ask that, yes."  Subsequently, after both parties indicated that they had

---

[20] Perhaps this is because while the Child Custody Act, MCL 722.21 *et seq*., requires the trial court in custody cases to take a child's preference into consideration as long as the court considers the child to be of sufficient age to express a preference, MCL 722.23(i), the juvenile code does not require a trial court to consider a child's preference in a termination-of-parental-rights case.  This may have something to do with the nature of these proceedings.  A termination of parental rights is permanent, whereas a custody order can be modified.

no further proofs, the trial judge indicated that he was considering speaking with JF but admitted that there was no statute that provides for such an interview, and he asked the parties if they had any objections. In response, respondent-father's counsel stated, "I would actually request it," and respondent-mother's counsel stated, "We encourage the court to talk with [JF]."

I also believe the parties were well aware that the judge was planning on speaking with JF in chambers. There was never any mention of her testifying in court; rather, the matter was always stated in terms of the judge "interviewing," "speaking with," and "talking with" JF. Furthermore, the guardian ad litem asked the judge if he would be interviewing JF "here at the court or at the Lutheran [family services office]?" And the judge responded, "[L]et's go to the back chambers." In light of these statements, I believe it was reasonably clear that the judge planned to interview JF off the record in his chambers, and the parties not only did not object, but they affirmatively encouraged the judge to talk with JF. Therefore, the issue was waived, and "[o]ne who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted).

## IV. CONCLUSION

Because I believe the Court of Appeals correctly held that: (a) respondents cannot collaterally attack the instant adjudication after their parental rights have been terminated, (b) respondents waived the issue pertaining to the interview of the child, and (c) any error in visiting respondents' home was harmless, I would affirm the judgment of the Court of

29

Appeals. In addition, and unlike the majority, I would not overrule *Hatcher*, even if in light of our new court rules, the impact of so doing would only be upon this single case, this single child, JF alone. Just as the new court rules reasonably balance the rights of parents and children, and afford a clear opportunity for a fresh start for the abused or neglected child, so too did the prior court rules; it is not right that JF *alone* should be made subject to a *third* court rule regime, an altogether singular regime, a regime that does not, in my judgment, reasonably balance the interests of parent and child, a regime in which, before *JF*'s fresh start can begin, a lengthy re-do of an already lengthy and fair legal process must first proceed because of the failure of respondents-- already deemed by a court of law to have acted neglectfully-- to have abided by the law in pursuing a timely appeal, much less to have corrected their maltreatment of JF. Thus, in a realm of the law in which reasonable expedition of decision-making has always been thought by the judiciary to be paramount, the majority imposes in this single case a process that is reflective of our legal system at its most unnecessarily drawn out and dilatory. For all the reasons set forth in this opinion, I respectfully dissent.[21]

Stephen J. Markman
Brian K. Zahra

CAVANAGH, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

---

[21] Notably, the majority overrules *Hatcher*, reverses the judgment of the Court of Appeals, and remands to the trial court for further proceedings without providing any guidance concerning what number of years of further proceedings are required. The majority fails even to make clear whether JF can remain in foster care or whether she, a child suffering from spina bifida and chronic kidney disease, must now be returned to respondents' home, one in which she has already suffered considerably from medical and physical neglect.